**NOTICE:   SLIP OPINION**
**(not the court's final written decision)**

The opinion that begins on the next page is a slip opinion.  Slip opinions are the written opinions that are originally filed by the court.

A slip opinion is not necessarily the court's final written decision.  Slip opinions can be changed by subsequent court orders.  For example, a court may issue an order making substantive changes to a slip opinion or publishing for precedential purposes a previously "unpublished" opinion.  Additionally, nonsubstantive edits (for style, grammar, citation, format, punctuation, etc.) are made before the opinions that have precedential value are published in the official reports of court decisions: the Washington Reports 2d and the Washington Appellate Reports.  An opinion in the official reports replaces the slip opinion as the official opinion of the court.

**The slip opinion that begins on the next page is for a published opinion, and it has since been revised for publication in the printed official reports.**  The official text of the court's opinion is found in the advance sheets and the bound volumes of the official reports.  Also, an electronic version (intended to mirror the language found in the official reports) of the revised opinion can be found, free of charge, at this website: https://www.lexisnexis.com/clients/wareports.

For more information about precedential (published) opinions, nonprecedential (unpublished) opinions, slip opinions, and the official reports, see https://www.courts.wa.gov/opinions and the information that is linked there.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

| | |
|---|---|
| STATE OF WASHINGTON,<br><br>               Respondent,<br><br>        v.<br><br>CORNELIUS RED RITCHIE,<br><br>               Appellant. | DIVISION ONE<br><br>No. 82920-3-I<br><br>PUBLISHED OPINION |

DWYER, J. — Cornelius Ritchie appeals from the judgment entered on a jury's verdict finding him guilty of three counts of assault in the second degree, one count of felony harassment, and one count of assault in the fourth degree. Ritchie contends that the trial court committed an error of constitutional magnitude by excluding evidence that two testifying witnesses had been illegally occupying property when encountered by law enforcement four months after the incident leading to Ritchie's arrest. Ritchie further contends that the prosecutor committed misconduct during closing argument, that his persistent offender sentence is cruel and unusual, and that the trial court violated his right to a jury determination of his prior convictions. Finding no error, we affirm.

I

Ritchie resided in a trailer in the parking lot behind the Lochsloy store, located on Highway 92 between Lake Stevens and Granite Falls in Snohomish County. In the afternoon of December 18, 2019, Ritchie was involved in an

altercation with Deborah Garibay, the owner of the trailer in which he resided. According to Garibay, while outside of the trailer, Ritchie hit her in the head once with a baseball bat, knocking her to the ground. Ritchie then tossed the baseball bat and struck Garibay several more times with his fists. Garibay attempted to run, but Ritchie pursued her, still attempting to hit her.

Amanda Duran and Cody Chapin were sitting in their car in the Lochsloy store parking lot. Duran and Chapin saw Ritchie pursuing Garibay and decided to intervene. Chapin got out of the car and confronted Ritchie. In response, Ritchie threatened to kill both Chapin and Duran. Duran remained in the car but shouted at Ritchie that she had mace that she would use if Ritchie did not stop his pursuit of Garibay. Ritchie responded that he did not care and would "eat" the mace. Duran then told Ritchie that if he was a man, he would walk away. Ritchie stopped at that point and walked back to the trailer.

Garibay got into the back seat of Chapin's vehicle. According to Duran and Chapin, Garibay asked Chapin to drive her to her truck, which was parked in another part of the lot. Chapin attempted to oblige. However, Ritchie reached the truck first, took the keys that Garibay had left inside the vehicle, and started the vehicle.

Chapin drove out of the parking lot and onto Highway 92, heading toward Granite Falls. Ritchie followed in Garibay's truck. According to Chapin, Duran, and Garibay, the vehicles were traveling well in excess of the 55 miles-per-hour speed limit. Ritchie used the truck to ram the back of Chapin's vehicle. Chapin asserted that this caused him to cross the center line and force a semi-truck off

2

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

the road.  However, Chapin claimed that his car was not seriously damaged during this chase.  Law enforcement could neither confirm nor rule out that the vehicles had contacted one another because they were never able to inspect Chapin's vehicle.

Ritchie stopped following Chapin's vehicle after Chapin turned onto Crooked Mile Road.  Once on Crooked Mile Road, Chapin pulled into the driveway of a friend's house.  Chapin, Duran, and Garibay then got out of the vehicle and entered the house.  Soon thereafter, Chapin's friend escorted Garibay to the nearby Granite Falls Fire Department in order to seek medical attention.  Duran and Chapin later followed on foot.

Garibay arrived at the fire station at approximately 5:00 p.m.  Fire department personnel contacted the Snohomish County Sheriff's Office; Deputies William Kleckley and Joseph Dunn responded.  Upon arrival, Deputy Kleckley observed Garibay secured in an ambulance cot and appearing "very distraught."  Deputy Kleckley spoke with Garibay briefly, before he and Deputy Dunn obtained a joint statement from Chapin and Duran.  Garibay was taken to the hospital via ambulance; Deputy Kleckley followed in order to further speak with her.  Deputy Dunn remained at the fire station while waiting for Duran and Chapin to complete their written statement.

Garibay was seen at the emergency room by forensic nurse examiner Sherri Weyker.  Initially, Weyker asked Garibay to provide her with a narrative of the events that led to her hospital visit.  Weyker recorded this information in her report before conducting a medical examination.  Garibay reported that she felt

some tenderness on her head and some pain on her left flank. Weyker observed some slight bumps on Garibay's head, but did not make note of or photograph them as they were not visibly a sign of injury. Weyker did not observe any bruises aside from a small unrelated bruise on Garibay's right breast. Deputy Kleckley obtained a written statement from Garibay at the hospital.

The State charged Ritchie with three counts of assault in the second degree based on the use of a deadly weapon for ramming Chapin's vehicle, one count of felony harassment for threatening to kill Chapin, and one count of assault in the fourth degree for his altercation with Garibay.[1] Ritchie was originally tried in March 2021. The jury in that trial could not reach a verdict, and the trial court declared a deadlock and discharged them. Ritchie was tried a second time in May 2021.

At trial, defense counsel's theory of the case was that the events described by Garibay, Duran, and Chapin had never occurred. To support his theory, defense counsel sought to introduce testimony from Deputy Kleckley about an occasion in April 2020, four months after the events for which Ritchie was charged, when he witnessed Chapin, Duran, and Garibay together. On that occasion, Deputy Kleckley was dispatched to a property in Granite Falls to serve a trespass notice on two individuals – Chapin and Duran. When he arrived, Deputy Kleckley encountered Garibay, who told him that she was there to relay information from the prosecutor about upcoming court dates.

___

[1] Ritchie was also charged with a second count of harassment, six counts of violation of a court order, and taking a motor vehicle without permission. The State voluntarily dismissed all of these counts.

No. 82920-3-I/5

In ruling on the admissibility of defense counsel's proffered evidence, the trial court found that the encounter itself was relevant to the credibility of Garibay, Chapin, and Duran, who had previously reported that they were not acquainted before the events in December 2019. However, the trial court questioned the relevance of the reason for Deputy Kleckley's presence, i.e., that Deputy Kleckley was there to conduct an eviction of trespassers. Defense counsel asserted that the evidence was relevant, but admitted that he thought "the value [of the evidence] is marginal" and was "not crucial to the defense case." The trial court ruled that "any probative value" regarding Chapin's and Duran's unlawful occupation of the property was "grossly outweighed by the danger of unfair prejudice." The trial court did, however, permit defense counsel "to go into the fact that Ms. Garibay was contacted in the presence of these individuals."

During the second trial, Deputy Kleckley, Duran, Chapin, and Garibay all testified about the April 2020 encounter. Deputy Kleckley testified that when he encountered Garibay in April 2020, Garibay reported that she was there to tell Chapin and Duran to contact the prosecutor regarding upcoming court dates. In her own testimony, Garibay insisted that she did not say this and, to the contrary, had informed Deputy Kleckley that she was there to help Chapin and Duran move. Chapin and Duran similarly testified that Garibay was there to help them move and that they had asked for Garibay's help that morning.

The jury convicted Ritchie on all counts. Because he had previously been convicted of at least two most serious offenses, Ritchie was sentenced under the

5

No. 82920-3-I/6

Persistent Offender Accountability Act of the Sentencing Reform Act of 1981[2] (POAA).  Ritchie was sentenced to life in prison without the possibility of parole on the three counts of assault in the second degree, 60 months imprisonment on the count of harassment, and 364 days imprisonment on the count of assault in the fourth degree, to be served concurrently.

II

Ritchie asserts that the trial court erred by excluding evidence that Duran and Chapin were trespassing on the day that Deputy Kleckley saw them with Garibay.  He contends that this purported error violated his right to confront the witnesses against him (phrased as the right to present a defense) and, thus, reversal is required.  Because the fact that Duran and Chapin were trespassing in April 2020 had only the most minimal, tangential relevance to the charges against Ritchie, we disagree.

When a criminal defendant asserts that an evidentiary ruling has violated his constitutional right "to present a defense," we engage in a two-part analysis.  First, we review the trial court's ruling for an abuse of discretion, applying the evidentiary rule or evidentiary statute at issue.  State v. Arndt, 194 Wn.2d 784, 797, 453 P.3d 696 (2019).  Second, we consider de novo whether there has been a violation of the defendant's Sixth Amendment rights.  Arndt, 194 Wn.2d at 797.

A

For evidence to be admitted at trial, it must be relevant.  ER 402.

---

[2] Ch. 9.94A RCW.

6

No. 82920-3-I/7

Evidence is relevant if it tends to prove or disprove the existence of a fact of consequence to the outcome of the case. State v. Weaville, 162 Wn. App. 801, 818, 256 P.3d 426 (2011). Relevant evidence "may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence." ER 403.

To be sure, the relationship between Duran, Chapin, and Garibay was relevant to Ritchie's defense. For this reason, the trial court properly permitted defense counsel "to go into the fact that Ms. Garibay was contacted in the presence of these individuals" in April 2020. And defense counsel did elicit testimony from Duran, Chapin, Garibay, and Deputy Kleckley regarding the April 2020 encounter. Deputy Kleckley testified that he saw Duran, Chapin, and Garibay together; Chapin and Duran testified that they had contacted Garibay about needing her assistance that same day; and Deputy Kleckley and Garibay gave conflicting testimony regarding Garibay's statements to the deputy during the encounter. The *only* evidence the trial court excluded was the evidence that Chapin and Duran were trespassing on the day that Deputy Kleckley encountered them.

The trial court correctly determined that the probative value of this evidence was substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury. Trespassing is not probative of dishonesty in and of itself. Defense counsel even admitted that the nature of the encounter had very little relevance, stating that "the value is marginal" and the

7

evidence "is not crucial to the defense case."  This is especially so when defense counsel was able to discredit the testimony of the witnesses in a multitude of other ways.

That Chapin and Duran were trespassing in April 2020 had no bearing on Ritchie's guilt or innocence.  Accordingly, the trial court did not abuse its discretion by declining to admit this evidence pursuant to ER 403.

B

The second step in our analysis requires us to examine whether the trial court's ruling, despite being a proper application of the evidentiary rules, nonetheless runs afoul of either the state or federal constitutions.[3]  There has been some confusion as to what this second step entails.  It is not the case, as Ritchie would have us hold, that phrasing an evidentiary ruling as a constitutional claim provides a means for an end run around the Rules of Evidence.  See State v. Lizarraga, 191 Wn. App. 530, 553, 364 P.3d 810 (2015).  Nor is the second step analysis merely a repetition of the analysis undertaken at step one.  Rather, we articulate what has remained the underlying concern of the courts in deciding "right to a defense" cases: whether there is a unique or aberrant rule that results in the defendant having a lesser Sixth Amendment right than that possessed by citizens in other jurisdictions or persons charged with a different crime in the

---

[3] Ritchie asserts that the trial court violated his right under the state and federal constitutions to "present a defense."  Neither the state nor the federal constitutions mention any such right.  Ritchie's argument is more appropriately classified as a violation of the right to confront the witnesses against him, which is specifically enumerated in both the federal and state constitutions.  U.S. CONST. amend. VI; CONST. art. I, § 22.

8

same jurisdiction. Review of the relevant case law tells us that this is so.

1

The notion of a "right to present a defense" has its origins in the United States Supreme Court's seminal decision in Chambers v. Mississippi, 410 U.S. 284, 93 S. Ct. 1038, 35 L. Ed. 2d 297 (1973). In Chambers, Gable McDonald confessed in a sworn writing to the murder of a police officer, a crime for which Leon Chambers had been charged. McDonald also orally admitted to the crime in the presence of at least three witnesses. But McDonald later repudiated his confession. Chambers, 410 U.S. at 287-88. At trial, Chambers attempted to elicit evidence of McDonald's written confession and his three oral admissions. Chambers, 410 U.S at 289. Initially, Chambers requested to be allowed to call McDonald as an adverse witness. Chambers, 410 U.S at 291. The trial court allowed Chambers to call McDonald; however, due to an antiquated Mississippi common law rule requiring that the party calling a witness vouch for the veracity of that witness's testimony, the trial court denied Chambers the ability to treat McDonald as a hostile witness in order to impeach his testimony should he repeat his repudiation of the written confession. Chambers, 410 U.S at 291. As a result, Chambers was unable to question McDonald concerning his written confession and challenge his testimony should he reassert his repudiation.

Chambers then sought to introduce testimony from the lay witnesses before whom Chambers uttered his admissions. Chambers, 410 U.S at 292. The State objected to the proffered testimony as hearsay. The trial court sustained this objection because Mississippi's evidence rules did not at that time

9

No. 82920-3-I/10

recognize statements against penal interest as an exception to the prohibition against hearsay. Chambers, 410 U.S at 292. Thus, Chambers was unable to put McDonald's confession in front of the jury, challenge McDonald's repudiation of the confession, or present witnesses to testify to his admissions and that the repudiation was not credible. Chambers, 410 U.S at 294. In truth, the rulings gutted Chambers' defense.

As the Supreme Court noted,

> In sum, then, this was Chambers' predicament. As a consequence of the combination of Mississippi's 'party witness' or 'voucher' rule and its hearsay rule, he was unable either to cross-examine McDonald or to present witnesses in his own behalf who would have discredited McDonald's repudiation and demonstrated his complicity.

Chambers, 410 U.S. at 294.

In deciding the case, the Supreme Court first held that Mississippi's antiquated rule prohibiting Chambers from cross-examining a witness he called to testify (McDonald) violated his right to confront the witnesses against him. Chambers, 410 U.S at 295. The Court held that whether a witness was "against" the defendant did not depend on the technicality of who called the witness to testify but, rather, depended on whether the witness's testimony inculpated the defendant. Chambers, 410 U.S at 297. McDonald's repudiation of his confession so inculpated Chambers. Chambers, 410 U.S at 297.

The Court held that the trial court's error in denying the opportunity to confront McDonald was further compounded by its refusal to allow Chambers to call the three lay witnesses to McDonald's oral admissions as trial witnesses.

10

No. 82920-3-I/11

Chambers, 410 U.S at 298.  Although the Court did not strike down Mississippi's

hearsay rule, it held that such rules may not be applied "mechanistically to defeat

the ends of justice" "where constitutional rights directly affecting the

ascertainment of guilt are implicated."  Chambers, 410 U.S at 302.

In sum, because Mississippi's rules prohibited Chambers from calling

witnesses whose testimony was fundamental to the determination of guilt or

innocence, even proper application of those rules violated Chambers' Sixth

Amendment rights, incorporated against the states through the Fourteenth

Amendment due process clause, to present witnesses in his favor and to

confront witnesses against him.  Chambers, 410 U.S at 302.[4]

One year later, the Supreme Court revisited the right to confront

witnesses.  See Davis v. Alaska, 415 U.S. 308, 94 S. Ct. 1105, 39 L. Ed. 2d 347

(1974).  In that case, the defendant, charged with burglary, sought to cross-

examine the state's primary witness about the fact that the witness was on

probation for a burglary conviction as a juvenile offender.  By doing so, Davis

sought to demonstrate that the witness "acted out of fear or concern of possible

jeopardy to his probation."  Davis, 415 U.S. at 311.  However, the trial court

excluded any mention of the witness's probationary status, relying on a statute

and a juvenile procedural rule that barred the introduction of juvenile

adjudications as evidence in a court of general jurisdiction unless used for

sentencing purposes.  Davis, 415 U.S. at 311.  Thus, when the witness testified

---

[4] See also U.S. CONST. amend. VI ("In all criminal prosecutions, the accused shall enjoy the right . . . to have compulsory process for obtaining witnesses in his favor.").

11

that he had no reason to fear law enforcement and had never previously been questioned by law enforcement, Davis was unable to confront the witness and discredit that testimony. <u>Davis</u>, 415 U.S. at 313-14. Davis was subsequently convicted of burglary and grand larceny. <u>Davis</u>, 415 U.S. at 314.

The Supreme Court reversed the conviction. Noting the importance of the witness's testimony in securing Davis's conviction, the Court held that the defendant's right to confrontation was violated by the trial court's application of the statute and rule so as to exclude evidence of the witness's probationary status. <u>Davis</u>, 415 U.S. at 317-18. With all evidence of the witness's juvenile adjudication excluded, defense "counsel was unable to make a record from which to argue *why* [the witness] might have been biased or otherwise lacked that degree of impartiality expected of a witness at trial." <u>Davis</u>, 415 U.S. at 318. Notably, the defendant would not have been so restricted in presenting his defense had the witness's conviction not been in juvenile court. Thus, Davis's Sixth Amendment right to confrontation was restricted in a way that did not generally apply either to other Alaskan defendants or to defendants in other states. The Court held that, on the facts presented, the defendant was completely denied the "right of effective cross-examination" and, accordingly, his right to confrontation was violated. <u>Davis</u>, 415 U.S. at 318.

2

Seminal Washington cases interpreting the Sixth Amendment rights to cross-examination and compulsory process have been similarly concerned with unique, aberrant, new, or not generally applicable rules of evidence or procedure.

12

No. 82920-3-I/13

Indeed, the two-step analytical test outlined in Arndt and refined in State v. Jennings, 199 Wn.2d 53, 502 P.3d 1255 (2022), has its origins in State v. Hudlow, 99 Wn.2d 1, 659 P.2d 514 (1983). Hudlow concerned the implications of Washington's adoption of a rape shield statute, passed by the legislature in 1975. 99 Wn.2d at 6; LAWS OF 1975, 44th Leg.,1st Ex. Sess. ch. 14, § 1. Rape shield statutes were an advent of the mid-1970s, and Washington was one of the first states to enact one.[5]

In Hudlow, the court held that the exclusion of evidence sought to be admitted by the defendant is justified when there is a compelling state interest for the exclusion. 99 Wn.2d at 16. The court further noted that the rape shield statute serves multiple compelling state interests, including achieving just trials based on truth-finding rather than based on prejudice against rape victims premised on their prior sexual activity, and encouraging rape victims to report the crimes committed against them. Hudlow, 99 Wn.2d at 16. Accordingly, when evidence of a victim's sexual history is of little relevance, the state's compelling interests outweighed the need for the evidence's introduction. Hudlow, 99 Wn.2d at 16. On the other hand, when the proffered evidence is of high probative value, "no state interest can be compelling enough to preclude its introduction consistent with the Sixth Amendment and Const. art. 1, § 22." Hudlow, 99 Wn.2d at 16. While, 40 years later, Washington's rape shield statute is accepted as a well-established aspect of our existing evidentiary rules and its facial

---

[5] Rape shield statutes, 1 Wharton's Criminal Evidence § 4:41 (15th ed.).

13

constitutionality is beyond question, that was not yet evident at the time Hudlow

was decided.

Similar concerns were recently at play in State v. Chicas Carballo, 17 Wn.

App. 2d 337, 486 P.3d 142, review denied, 198 Wn.2d 1030 (2021).  Therein, we

were concerned with evidence that had been excluded pursuant to ER 413.

Chicas Carballo, 17 Wn. App. 2d at 345.  ER 413 was a newly promulgated

evidentiary rule, adopted by the Supreme Court in September 2017, 189 Wn.2d

1120, prohibiting the introduction of evidence concerning a person's immigration

status unless certain procedural requirements are met.  ER 413(a).  This rule

was all but unique in the United States, as, at the time, only one other state had a

similar evidence rule.  See CAL. EVID. § 351.3.[6]

In Chicas Carballo, the trial court prohibited the defendant from

questioning the codefendant's girlfriend, the only live witness to the crime,

concerning her immigration status due to his failure to follow the procedures set

forth in ER 413, which had gone into effect a month before trial.  17 Wn. App. 2d

at 347.  We reversed, holding that "rules that impose procedural requirements

cannot be wielded as a sword by the State to defeat the constitutional rights of an

accused in a criminal trial."  Chicas Carballo, 17 Wn. App. 2d at 349.  The

evidence sought to be admitted was highly probative, given that the witness had

been threatened with deportation if she did not cooperate in the police

investigation.  Thus, no state interest could have outweighed its value to the truth

_____

[6] California's statute was repealed by its own terms as to criminal matters in 2022.
Currently the only other state with a rule similar to ER 413 is Pennsylvania.  See PA. EVID. R. 413.

14

No. 82920-3-I/15

seeking function.[7]  This was particularly so because the state had suffered no prejudice whatsoever as a result of the defendant's failure to follow the newly minted rules of procedure.  Chicas Carballo, 17 Wn. App. 2d at 350-51.

3

Ultimately, the pertinent concern is whether both parties receive a fair trial. State v. Darden, 145 Wn.2d 612, 622, 41 P.3d 1189 (2002).  As Chambers, Davis, Hudlow, and Chicas Carballo all demonstrate, that concern is heightened when a new or antiquated rule appears to threaten the defendant's right to a fair trial.  The concern is not as paramount when the rule being applied is a well-established, commonly utilized rule that has been applied time and again without any demonstrated detriment to the fairness of proceedings.  Such is the case with rules such as ER 403, a version of which is accepted in every court in this nation and which have been utilized in one form or another for many decades.

Recognizing that there is room for wide application of established rules of evidence within the boundaries of the constitution, the United States Supreme Court has noted that "trial judges retain wide latitude insofar as the Confrontation Clause is concerned to impose reasonable limits on such cross-examination based on concerns about, among other things, harassment, prejudice, confusion of the issues, the witness' safety, or interrogation that is repetitive or only marginally relevant."  Delaware v. Van Arsdall, 475 U.S. 673, 679, 106 S. Ct. 1431, 89 L. Ed. 2d 674 (1986).  Our Supreme Court has recognized similar

---

[7] Indeed, 48 other states had perceived no state interest compelling enough to have adopted a similar rule.

15

No. 82920-3-I/16

limitations to the same right. State v. Orn, 197 Wn.2d 343, 352, 482 P.3d 913 (2021) (ER 403 serves "a permissible purpose" under constitution); accord Jennings, 199 Wn.2d at 63.

"At its core, the constitutional right to present a defense ensures the defendant has an opportunity to defend against the State's accusations." Jennings, 199 Wn.2d at 66. But "the Confrontation Clause guarantees only 'an *opportunity* for effective cross-examination, not cross-examination that is effective in whatever way, and to whatever extent, the defense might wish.'" Kentucky v. Stincer, 482 U.S. 730, 739, 107 S. Ct. 2658, 96 L. Ed. 2d 631 (1987) (quoting Delaware v. Fensterer, 474 U.S. 15, 20, 106 S. Ct. 292, 88 L. Ed. 2d 15 (1985)). Accordingly, when the defendant has an opportunity to present his theory of the case, the exclusion of some aspects of the defendant's proffered evidence will not amount to a violation of the defendant's constitutional rights. Jennings, 199 Wn.2d at 66. To be sure, "[t]he ability of the defendant to achieve through other means the effect that the excluded examination allegedly would have produced is a factor indicating that his right to confrontation was not violated." United States v. Drapeau, 414 F.3d 869, 875 (8th Cir. 2005).

4

Here, Ritchie's theory of the case was that Duran, Chapin, and Garibay were not credible witnesses and that Garibay was using her friends to fabricate a story and frame Ritchie. Evidence that Duran, Chapin, and Garibay were seen together—months after the events at issue—was properly deemed relevant to that defense theory. Indeed, Ritchie was able to elicit testimony about the April

16

2020 encounter from multiple witnesses during trial. Furthermore, one of the witnesses opined that Duran, Chapin, and Garibay were now "best friends" "for the rest of our lives." However, the fact that Duran and Chapin were trespassing in April 2020 does not tend to prove that the three people were engaged in a conspiracy to frame Ritchie.

Furthermore, evidence that Duran and Chapin were trespassing was not essential to demonstrating a lack of credibility in the testimony of Duran, Chapin, or Garibay. Defense counsel was able to attack the credibility of these witnesses in a myriad of ways including the following:

- Introducing global positioning system (GPS) data[8] showing Ritchie's whereabouts on the afternoon of December 18, 2019, demonstrating that the events did not occur at the time(s) claimed by the witnesses;

- Introducing GPS data showing Ritchie's speed of movement, which tended to demonstrate that the vehicle in which he was traveling did not exceed the speed limit, contrary to the witnesses' testimony;

- Eliciting testimony from Chapin that his car sustained no damage, even though he claimed to have been struck at over 60 miles per hour;

- Eliciting testimony from Duran and Chapin that the events testified to by them could not have lasted more than half an hour, leaving approximately two hours of the afternoon unaccounted for;

- Eliciting testimony from Garibay that Ritchie did not pull on her hair, contrary to Duran and Chapin's testimony;

---

[8] Ritchie was wearing a GPS monitor as a condition of his probation for a prior conviction.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

- Eliciting testimony from Garibay that she did not ask Chapin to drive her to her truck, contrary to Duran and Chapin's testimony;

- Eliciting testimony from Weyker that all of Garibay's teeth were intact, contrary to Garibay's testimony;

- Eliciting testimony from Weyker that Garibay had no visible bumps on her head, despite Garibay's claim that she had been hit with a baseball bat;

- Eliciting testimony from Weyker that Garibay had no trouble walking to and from the restroom, contrary to Garibay's testimony at trial;

- Eliciting testimony from the responding deputies that they do not share contact information among witnesses, contrary to Garibay's claim that she learned of Chapin's and Duran's names from law enforcement;

- Eliciting testimony from Garibay contrary to what she told Deputy Kleckley concerning why she was with Chapin and Garibay in April 2020;

- Questioning Chapin about his refusal to identify the friend at whose house he parked on the date of the incident;

- Questioning Duran and Chapin about prior inconsistent statements related to the time of day the incident occurred;

- Questioning Duran, Chapin, and Garibay about the number of times Ritchie struck the back of Chapin's vehicle (and receiving a different answer from each witness);

- Confronting Garibay with her prior inconsistent statements concerning

18

the nature of her relationship with Ritchie.

Because Ritchie was able to attempt to discredit Garibay, Duran, and Chapin in all of these ways, introducing evidence that Duran and Chapin were illegally occupying property in April 2020 would have added nothing of value to Ritchie's defense. In other words, the evidence excluded was not highly probative evidence, the exclusion of which could give rise to a constitutional violation. Rather, the trial court's ruling was nothing more than a standard application of ER 403. The trial court's evidentiary ruling did not violate Ritchie's rights under ER 403, the Sixth Amendment, or article I, section 22.

III

Ritchie next asserts that the prosecutor committed misconduct during closing argument and that this misconduct deprived him of a fair trial. The State counters that no misconduct occurred and, if it did, Ritchie has failed to demonstrate any prejudice. We agree with the State.

A defendant claiming prosecutorial misconduct has the burden to prove that the prosecutor's conduct was both improper and prejudicial. State v. Fisher, 165 Wn.2d 727, 747, 202 P.3d 937 (2009). "Once proved, prosecutorial misconduct is grounds for reversal where there is a substantial likelihood the improper conduct affected the jury." Fisher, 165 Wn.2d at 747.

When reviewing a prosecutor's statements during closing argument, we view the statements in the context of the entire argument. Fisher, 165 Wn.2d at 747. The prosecutor has "wide latitude in making arguments to the jury and prosecutors are allowed to draw reasonable inferences from the evidence."

State v. Gregory, 158 Wn.2d 759, 860, 147 P.3d 1201 (2006) (citing State v. Gentry, 125 Wn.2d 570, 641, 888 P.2d 1105 (1995)), overruled on other grounds by State v. W.R., 181 Wn.2d 757, 336 P.3d 1134 (2014). References to evidence outside the record constitute misconduct. Fisher, 165 Wn.2d at 747 (citing State v. Belgarde, 110 Wn.2d 504, 507-08, 755 P.2d 174 (1988)). Additionally, it is misconduct to denigrate the role of defense counsel. State v. Warren, 165 Wn.2d 17, 29-30, 195 P.3d 940 (2008). However, "[i]f defense counsel failed to request a curative instruction, the court is not required to reverse." Fisher, 165 Wn.2d at 747 (citing State v. Russell, 125 Wn.2d 24, 85, 882 P.2d 747 (1994)).

A

Ritchie alleges that the prosecutor committed misconduct in two distinct ways. First, Ritchie asserts that the prosecutor committed misconduct by referencing excluded evidence. In her closing argument, the prosecutor argued:

> So she goes to the hospital for medical treatment, and she is complaining of pain, she's shaky, she's crying, she's got the headache, the whole bit, and her body hurts. And a person who has been beaten like that, of course your body is going to hurt, and you are going to know your body is going to hurt and are going to think that's because you're bruised. And later you see bruises. You're like yeah, I had bruises.

Defense counsel objected to this argument. In response, the trial court stated, "This is argument. The jury has been instructed time and time again that this is argument. Proceed, please." The prosecution concluded this line of argument by stating, "But the fact is no one should be surprised Sherri Weyker did not yet observe bruises on Deborah Garibay from these events."

20

No. 82920-3-I/21

Ritchie asserts that this argument was a reference to the testimony of Deputy Edgar Smith concerning evidence of an incident on December 25, which the trial court had stricken from the record. Had this been the only testimony about bruising, Ritchie's argument might have merit. But it was not. Early in the trial, the prosecution asked forensic nurse Weyker whether she observed any bruises on Garibay during her examination. Weyker indicated that she had not. Later, the prosecution asked follow up questions about the lack of bruises:

> Q  Let's talk a little bit about bruising. If somebody is -- well, I guess, how long would it take for a bruise to show up if somebody is struck?
> A  That can vary on the individual.
> Q  Is there any sort of, I guess, a set time frame that we could put on something like that?
> A  No.
> . . . .
> Q  Based on your medical experience, would you expect bruises to have shown up by the time that you are speaking with Ms. Garibay about these events?
> A  I've done hundreds of cases. And there's a lot of times where they're reporting assault or injury where we do not see physical bruising, that it hasn't shown up visibly by the time I see a patient.

Moreover, during her testimony, Garibay denied that she told Weyker that she had no bruises:

> Q  And you had no bruises, correct?
> A  Not true.
> Q  Ma'am, you were specifically asked if you had any bruises, and you told Ms. Weyker no; isn't that correct?
> A  Not true. I don't believe so.

When viewed in context of the entire trial, we cannot say that the prosecutor committed misconduct by referencing bruises. Both before and after the statement to which the defense objected, the prosecutor referenced Weyker's

21

testimony that bruises might not show up right away. The prosecutor made no reference to Deputy Smith or anyone else viewing bruises on Garibay after the date of the incident. Rather, the argument advanced was that Garibay may have observed bruises on herself. Given Garibay's testimony on cross-examination, the prosecutor's argument was in reference to evidence that had not been excluded. It was thus not improper.

B

Similarly, the prosecutor's argument that Ritchie and Garibay were in a "toxic relationship" was not misconduct. First, unlike the other statements that Ritchie alleges constitute misconduct, Ritchie did not object to this statement. This argument is therefore considered waived unless the prosecutor engaged in misconduct so flagrant and ill-intentioned that no instruction to the jury could have cured the prejudice. State v. Padilla, 69 Wn. App. 295, 300, 846 P.2d 564 (1993).

In reviewing the record, there was evidence presented at trial concerning an earlier incident in which Ritchie broke Garibay's phone. There was evidence that Garibay had assaulted Ritchie, causing him injuries. There was also evidence that Garibay had reported to Nurse Weyker that Ritchie was her boyfriend. The prosecutor's description of the relationship between Ritchie and Garibay as "toxic" was a reasonable inference from the evidence presented at trial. Thus, contrary to Ritchie's argument, the prosecutor describing Ritchie and Garibay as being in a "toxic relationship" was not a flagrant and ill-intentioned instance of misconduct. No entitlement to appellate relief is demonstrated.

22

C

Ritchie next argues that the prosecutor committed misconduct by impugning defense counsel. Ritchie points to several statements made by the prosecutor during her rebuttal argument that seized on a misstatement by defense counsel during his closing argument. Specifically, the prosecutor argued during her closing argument:

> And so, [the witnesses] do their best to recount what happened, but the emotions and the feelings of it all affect that ability to recount and how they recount what happened. And everybody can have a slip of the tongue, or make a mistake, or say the wrong thing at any time. You don't have to be under the stress of giving testimony, you don't have to be under the stress of immediately just having this event happen to you to screw up.
>
> And I know that because the lawyers have done it in this trial. And we practice, and we prepare, and we have training, and we have experience, and we talk in front of people all the time. And, surely, we have our own thoughts and feelings about what ought to happen at the end of this trial.
>
> Nonetheless, Mr. Wackerman said, "well, Mr. Turim talked about the cameras on the store." That was the last witness, the defense investigator. He said absolutely nothing about video cameras at the store. Zero. There was nothing. And you were here and you observed it. And then you heard the argument, right? Anybody can mess anything up at any time. We don't seize upon Mr. Wackerman's mistake and say well, David Turim just must not have testified.

Defense counsel objected to this line of argument. In response, the trial court once again admonished the jury that counsel's arguments were not evidence. The prosecutor continued:

> In argument, Mr. Wackerman also said that Ms. Garibay had testified they turned onto Getchell Road.
> . . . .

23

> You're aware that nobody testified they turned onto Getchell Road. They all testified it was Crooked Mile Road, right? You can make these types of mistakes, and witnesses do before and after they testify.

Had the prosecutor argued that defense counsel was deliberately misstating the facts, that might have constituted misconduct. But the record does not demonstrate this. Instead, the prosecutor noted that defense counsel had made some inadvertent misstatements of fact in his closing argument, and that this was consistent with the notion that anyone can make mistakes when recounting events. This argument rested on the implication that defense counsel was otherwise honest – the exact opposite of impugning him. It was not misconduct for the prosecutor to make this argument.

D

Finally, the prosecutor's argument that she expected "defense to come up and lawyer all the language that was used by the victims variously to describe the events" and that the witnesses' testimony does not "have to be lawyered that way" also did not constitute misconduct. This argument was in reference to testimony by Duran and Chapin that they did not have a cell phone at the time of the incident, although they did have a device that could be used to make calls when connected to a wi-fi signal. When viewed in context, the prosecutor's statement about "lawyering" language was an argument that the witnesses did not need to have used precise language in order to be credible. This is not akin to arguments using words like "crock," "bogus," and "sleight of hand" that imply that defense counsel is lying. See State v. Lindsay, 180 Wn.2d 423, 433-34, 326 P.3d 125 (2014); State v. Thorgerson, 172 Wn.2d 438, 451-52, 258 P.3d 43

24

No. 82920-3-I/25

(2011).  The prosecutor's comments were a legitimate trial tactic and did not constitute misconduct.

E

Even if the prosecutor had committed misconduct in her closing argument, Ritchie would still not be entitled to the relief he seeks.  To obtain reversal, the defendant must demonstrate not only that the prosecutor committed misconduct, but also that the misconduct was prejudicial.  Fisher, 165 Wn.2d at 747.  While Ritchie objected to some of the statements that he alleges constitute misconduct, he neither requested a curative instruction nor moved for a mistrial.  "Defense counsel's failure to move for a curative instruction or a mistrial at the time strongly suggests the argument did not appear [irreparably prejudicial] in the context of the trial."  State v. Negrete, 72 Wn. App. 62, 67, 863 P.2d 137 (1993).  Furthermore, the trial court instructed the jury several times that counsels' arguments were not evidence.  The jury is presumed to have followed that instruction.  Warren, 165 Wn.2d at 29.[9]  In the absence of flagrant misconduct— and there was none—no entitlement to appellate relief is demonstrated.

IV

Ritchie further asserts that the imposition of a mandatory life sentence

---

[9] Ritchie also contends that his conviction should be reversed due to cumulative error. The cumulative error doctrine applies where a trial is affected by several errors that standing alone may not be sufficient to justify reversal.  State v. Greiff, 141 Wn.2d 910, 929, 10 P.3d 390 (2000).  The doctrine requires reversal where a combination of such errors denies the defendant a fair trial.  Greiff, 141 Wn.2d at 929.  However, where there are few or no errors, and the errors, if any, have little or no effect on the outcome of the trial, reversal is not required.  State v. Weber, 159 Wn.2d 252, 279, 149 P.3d 646 (2006).  Because there was no error at Ritchie's trial, his convictions are not subject to reversal for cumulative error.

without the possibility of parole under the POAA violated the state and federal constitutional guarantee against cruel and unusual punishment, as the punishment was grossly disproportionate to the offense of assault in the second degree. We disagree.

A

The Eighth Amendment states that "[e]xcessive bail shall not be required, nor excessive fines imposed, nor cruel and unusual punishments inflicted." U.S. CONST. amend. VIII. Similarly, the Washington Constitution protects against cruel punishment. CONST. art. I, § 14. Our Supreme Court has held that article I, section 14 is more protective that the Eighth Amendment. State v. Witherspoon, 180 Wn.2d 875, 887, 329 P.3d 888 (2014). Accordingly, if a sentence does not violate the Washington Constitution, we need not engage in an analysis under the Eighth Amendment.

In determining whether a sentence is cruel under our state constitution, we examine four factors: "(1) the nature of the offense, (2) the legislative purpose behind the statute, (3) the punishment the defendant would have received in other jurisdictions, and (4) the punishment meted out for other offenses in the same jurisdiction." State v. Rivers, 129 Wn.2d 697, 712-13, 921 P.2d 495 (1996) (citing State v. Fain, 94 Wn.2d 387, 397, 617 P.2d 720 (1980)).[10]

---

[10] The State contends that the Supreme Court analyzed these factors as they relate to second degree assault in State v. Moretti, 193 Wn.2d 809, 446 P.3d 609 (2019). This is not accurate. Moretti involved a facial challenge to the POAA based on the age of the offender at the time of a first strike conviction. 193 Wn.2d at 814. Furthermore, although all three of the offenders were convicted of assault in the second degree, those convictions were secondary to class A felonies. Moretti, 193 Wn.2d at 831. Here, second degree assault was the offense with the highest seriousness level under the Sentencing Reform Act for which Ritchie was convicted.

For the current opinion, go to https://www.lexisnexis.com/clients/wareports/.

No. 82920-3-I/27

B

The first factor is the nature of the offense. Assault in the second degree is designated as a "most serious offense." RCW 9.94A.030(32)(b). It is also designated as a "violent offense." RCW 9.94A.030(58)(a)(viii). Additionally, assault in the second degree is a crime against persons, not an "'entirely passive, harmless, and technical violation'" of a statute. Gonzalez v. Duncan, 551 F.3d 875, 886 (9th Cir. 2008) (28 years to life for failure to timely update sex offender registration was cruel and unusual) (quoting People v. Carmony, 26 Cal.Rptr.3d 365, 372 (2005)). Courts have rarely, if ever, found a sentence of life without parole for an adult offender to be grossly disproportionate to violent offenses against persons. Norris v. Morgan, 622 F.3d 1276, 1293 (9th Cir. 2010) ("[W]e are aware of no case in which a court has found a defendant's term-of-years sentence for a non-homicide crime *against a person* to be grossly disproportionate to his or her crime.").

Ritchie seizes on this factor, pointing out that the legislature has amended the definition of "most serious offense" to remove robbery in the second degree from the list. LAWS OF 2019, ch. 187, § 1. Notably, however, this was the *only* offense that the legislature removed from the list of "most serious offenses." LAWS OF 2019, ch. 187, § 1. The legislature has amended RCW 9.94A.030 several times since then and not once has it deigned to remove any other offenses from the list. Although assault in the second degree is listed at the same level of seriousness for sentencing purposes as robbery in the second degree, so is vehicular assault, which also remains on the list of "most serious

27

offenses." RCW 9.94A.030(32)(p), .515.  It is reasonable that the legislature would be far more concerned with crimes against persons, than with crimes primarily against property.  Indeed, as the State points out, the original version of Senate Bill 5288 amending RCW 9.94A.030 proposed removing assault in the second degree from the list of "most serious offenses," but the legislature ultimately rejected this proposal.  ENGROSSED SUBSTITUTE S.B. 5288, 66th Leg., Reg. Sess. (Wash. 2019).  We will not second guess the legislature's judgment.

Additionally, Ritchie's claim that the State's offer of a lower sentence during the plea bargaining process indicated that the State considered second degree assault to be a minor offense for which a life sentence was unwarranted is unfounded.  The State's interest at the plea bargaining stage is not necessarily to obtain a sentence that it believes to be the most just but, rather, to "persuade the defendant to forgo his right to plead not guilty."  Bordenkircher v. Hayes, 434 U.S. 357, 364, 98 S. Ct.  663, 54 L. Ed. 2d 604 (1978).  It has long been accepted that "a State may encourage a guilty plea by offering substantial benefits" including a greatly reduced sentence, "in return for the plea."  Corbitt v. New Jersey, 439 U.S. 212, 219, 99 S. Ct. 492, 58 L. Ed. 2d 466 (1978).  To hold that a sentence was cruel simply because the State had once offered a lower sentence as part of a guilty plea offer "would contradict the very premises that underlie the concept of plea bargaining itself."  Bordenkircher, 434 U.S. at 365.  Ritchie's decision to decline the plea offer was his choice, and his decision does not render his sentence unconstitutionally cruel.

No. 82920-3-I/29

C

The second factor we consider when determining whether a sentence is cruel under our state constitution is the legislative purpose of the POAA. The Supreme Court has on multiple occasions recognized that "the purposes of the persistent offender law include deterrence of criminals who commit three 'most serious offenses' and the segregation of those criminals from the rest of society." Rivers, 129 Wn.2d at 713; accord Witherspoon, 180 Wn.2d at 888. These goals are served by Ritchie's sentence. This is especially so given that Ritchie has in fact been convicted of not just three but nine most serious offenses.

D

Third, we consider the punishment the defendant would have received in other jurisdictions. Under persistent offender statutes across the country, mandatory life sentences are the exception rather than the rule.[11] In this regard, Washington is in the minority. "But even if they would have received shorter sentences in some other jurisdictions, 'this factor alone is not dispositive.'" State v. Moretti, 193 Wn.2d 809, 833, 446 P.3d 609 (2019) (quoting Witherspoon, 193 Wn.2d at 888).

E

The fourth and final factor we consider is the punishment imposed for similar offenses in the same jurisdiction. Following Washington's abolition of the death penalty, life without the possibility of parole is the harshest sentence that

---

[11] States with persistent offender statutes that impose mandatory life without parole are Georgia, Massachusetts, Mississippi, North Carolina, South Carolina, and Wyoming. GA. CODE ANN. § 17-10-7; MASS. GEN. LAWS CH. 279 § 25; MISS. CODE ANN. § 99-19-83; N.C. GEN. STAT. § 14-7.12; S.C. CODE ANN. § 17-25-45; WYO. STAT. ANN. § 6-10-201.

an offender may receive. Moretti, 193 Wn.2d at 833. But the POAA imposes a mandatory life sentence without the possibility of parole on *all* persistent offenders convicted of a "most serious offense." RCW 9.94A.570.

Considering these factors as a whole, Ritchie's sentence of life in prison without the possibility of parole does not violate article I, section 14 of the Washington Constitution, nor does it violate the Eighth Amendment. No Washington court has held that a life sentence under the POAA for a violent felony offense is unconstitutional, and we decline to do so today.

V

Ritchie lastly asserts that the trial court erred by imposing a sentence under the POAA because the existence of his previous strike offenses was not found by a jury. This argument is without merit.

In Apprendi v. New Jersey, the United States Supreme Court held that "[o]*ther than the fact of a prior conviction*, any fact that increases the penalty for a crime beyond the prescribed statutory maximum must be submitted to a jury, and proved beyond a reasonable doubt." 530 U.S. 466, 490, 120 S. Ct. 2348, 147 L. Ed. 2d 435 (2000) (emphasis added). The Washington Supreme Court has clarified that when a prior conviction is an element of the offense, it too must be found by a jury. State v. Roswell, 165 Wn.2d 186, 192, 196 P.3d 705 (2008). But prior convictions that warrant a sentence under the POAA are not an element of the offense. As the court held in Witherspoon, "under the POAA, the State must prove previous convictions by a preponderance of the evidence and the defendant is not entitled to a jury determination on this issue." 180 Wn.2d at 894;

No. 82920-3-I/31

accord State v. McKague, 159 Wn. App. 489, 517, 246 P.3d 558, aff'd, 172

Wn.2d 802, 262 P.3d 1225 (2011).  Ritchie was not entitled to a jury

determination of the existence of his prior convictions.

Affirmed.

Dwyer, J.

WE CONCUR:

Andrus, C.J.

31